UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IN RE CELLCYTE GENETICS SECURITIES LITIGATION, | Case No. C08-0047RSL |
| This Document Relates To: | ORDER GRANTING DEFENDANT PIERCE'S MOTION TO DISMISS |
| All Actions | |

## I. INTRODUCTION

This matter comes before the Court on defendant G. Brent Pierce's motion to dismiss plaintiffs' second amended consolidated class action complaint pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6). Plaintiffs, who are attempting to represent a class of investors, contend that Pierce violated Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 and Securities Exchange Commission ("SEC") Rule 10b-5. Specifically, plaintiffs contend that Pierce was responsible for various alleged misrepresentations in a promotional brochure regarding CellCyte.

Pierce argues that plaintiffs have failed to identify any misrepresentations attributable to him, and that their allegations of scienter and loss causation do not satisfy the pleading standards of the Private Securities Litigation Reform Act of 1995

ORDER GRANTING DEFENDANT
PIERCE'S MOTION TO DISMISS- 1

("PSLRA"), 15 U.S.C. §§ 78u-4 *et seq.* Pierce also contends that plaintiffs' "control person" allegations are insufficiently pled and must be dismissed.

The Court heard oral argument in this matter on September 22, 2009. For the reasons set forth below, the Court grants the motion.

## II. ANALYSIS

**A.     The Complaint.**

Plaintiffs filed this action on behalf of all persons who purchased the publicly-traded stock of CellCyte Genetics Corporation ("CellCyte") between July 16, 2007 and the date of this lawsuit. Plaintiffs also plan to seek class certification on behalf of purchasers of CellCyte securities between April 6, 2007 and January 9, 2008. Second Amended Consolidated Class Action Complaint ("SACC") ¶¶ 28, 29. CellCyte described itself as an emerging biotechnology company engaged in the discovery and development of stem cell therapeutic products. Id. ¶ 3. CellCyte's products would use a patient's own cells to treat a variety of conditions non-invasively. The theory of the complaint is that defendants overstated the viability and availability of CellCyte's products and the status of the company's product development. Plaintiffs allege that when the truth emerged, the value of CellCyte stock plummeted.

In this action, plaintiffs have sued CellCyte, Pierce, Gary Reys,[1] and Ronald Berninger. Reys and Berninger co-founded CellCyte and served as company officers. Pierce, a Canadian citizen, is a stock promoter who has been banned from trading

---

[1] Plaintiffs also allege that CellCyte and the other defendants misrepresented Reys' educational and professional background (the "resume fraud"). CellCyte, Reys, and Berninger filed a separate motion to dismiss, and plaintiffs are in settlement negotiations with those defendants. Plaintiffs do not assert allegations against Pierce based on the resume fraud.

ORDER GRANTING DEFENDANT
PIERCE'S MOTION TO DISMISS- 2

securities in Canadian exchanges, from acting as a director or officer of any publicly traded Canadian company, and from acting as a director or officer of certain issuers.

Plaintiffs allege that Pierce continued to operate as a stock promoter in Washington. He is the president of Stock Group, AG, a stock-promotion firm based in Zurich with an office in Bellingham. The SACC alleges that CellCyte paid a monthly consulting fee to Stock Group, AG to promote CellCyte. "Pierce and his company Stock Group, AG were behind a colorful twelve-page mailer distributed on or about October 2007 to potential U.S. and foreign buyers of CellCyte stock entitled, 'James Rapholz's Economic Advice'" (the "Rapholz brochure"). SACC at ¶ 24. Plaintiffs allege that Pierce and Stock Group, AG drafted the brochure's content and paid for its publication and distribution.

The SACC alleges that Pierce was the "primary author" of the Rapholz brochure. SACC at ¶ 79. Before the brochure was issued, Pierce submitted a Factual Information Review ("FIR") document for review and approval. Reys reviewed the content and initialed each of the pages of the FIR. Id. at ¶ 79. After Reys conducted his review, plaintiffs allege that Pierce supplemented the brochure's content with the following allegedly false statements:

- "Now, a practical 'pill-in-a-bottle' application puts the miracle of regenerative medicine within immediate reach." SACC at ¶ 83.

- "The technology is real. It's here now. It is heading into FDA testing. Because it's based on safe, naturally occurring proteins, FDA fast tracking, if granted, could allow more rapid approval of this revolutionary treatment." Id.

- "Repair your own heart . . . regenerative medicine in on the verge of an enormous and historic leap forward." Id.

- "Grow-your-own repair tissues! . . . . In the not-too-distant-future doctors should be able to inject stem cells from the patient's own body into a vein where the stem cells will target the heart to allow growth and repair of heart tissue." Id.

ORDER GRANTING DEFENDANT
PIERCE'S MOTION TO DISMISS- 3

1     ●     CellCyte's technology used a "patient's own adult stem cells rather than controversial embryonic form." Id. at ¶ 85.

    ●     "[I]n pre-clinical studies over 77% of the stem cells remained in place in the organ, compared to a mere 1 to 5% by current invasive methods. Id. at ¶ 86.

**B.     Private Securities Litigation Reform Act**.

In 1995, Congress raised the pleading requirements in private securities litigation to deter the routine filing of shareholder lawsuits whenever a significant change in a company's stock price occurred. Congress was particularly concerned with litigation based on nothing more than (1) speculation that the company "must have" engaged in foul play and (2) the faint hope that the liberal rules of discovery would turn up some supporting evidence. See Joint Explanatory Statement to the PSLRA, H.R. Conf. Rep. No. 104-369 (1995), *reprinted in* 1995 U.S.C.C.N. 730. In order to state a claim under § 10b of the Exchange Act and Rule 10b-5 plaintiffs "must allege: (1) a misstatement or omission (2) of a material fact (3) made with scienter (4) on which [plaintiffs] relied (5) which proximately caused their injury." DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 388 (9th Cir. 2002).

Unlike most civil litigation, allegations sufficient to put defendants on notice of the nature of the claim are insufficient under the PSLRA: private securities plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In order to withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the complaint must, as to each act or omission alleged to violate the securities laws, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Thus,

private securities plaintiffs must "plead with particularity both falsity and scienter." Ronconi v. Larkin, 253 F.3d 423, 429 (9th Cir. 2001).

In In re Silicon Graphics Inc. Securities Litig., 183 F.3d 970, 975-77 (9th Cir. 1999), the Ninth Circuit evaluated the requirements of the PSLRA, its legislative history, and the prior practice of the courts and determined that the required state of mind for purposes of § 78u-4(b)(2) is, at a minimum, a "deliberate recklessness" that reflects some degree of knowing misconduct. In order to give rise to a "strong inference" of "deliberate recklessness," securities plaintiffs may no longer rely on evidence which suggests that the corporation and/or its officers had a motive and opportunity to defraud the market: rather, the complaint must allege, with particularity, "facts indicating no less than a degree of recklessness that strongly suggests actual intent." 183 F.3d at 979. Recklessness is defined as "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." DSAM Global Value Fund, 288 F.3d at 389.

The Court recognizes that *Silicon Graphics* and its progeny make it very difficult for private securities litigants: in order to survive a motion to dismiss, plaintiffs must possess, at the time of filing, evidence that defendants had knowledge of, or were deliberately reckless regarding, the falsity of public statements at the time they were made.[2] Simply alleging that statements were knowingly false is not enough. Such

---

[2] Plaintiffs can no longer file a claim and hope that discovery will provide the necessary proof:

In the absence of greater particularity and more incriminating facts, we have

ORDER GRANTING DEFENDANT
PIERCE'S MOTION TO DISMISS- 5

1  allegations must be supported with references to the specific facts, documents, and/or
2  reports. In order to determine whether the complaint gives rise to a strong inference of
3  intentional or deliberately reckless conduct, the Court must assess the allegations
4  "holistically," along with plausible nonculpable explanations for defendant's conduct.
5  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 326 (2007). Although "[t]he
6  inference that defendant acted with scienter need not be irrefutable . . . [it] must be more
7  than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong
8  in light of other explanations. A complaint will survive . . . only if a reasonable person
9  would deem the inference of scienter cogent and at least as compelling as any opposing
10 inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324. Thus, the
11 PSLRA compels a rigorous analysis of the complaint to determine whether the
12 allegations, taken collectively, give rise to a strong inference that defendant lied or was
13 deliberately reckless.

**C.      Evidentiary Issues.**

In reviewing this motion to dismiss, the Court may consider the SACC, materials incorporated into the SACC by reference, and matters of which the Court may take

---

> no way of distinguishing [plaintiffs'] allegations from the countless "fishing expeditions" which the PSLRA was designed to deter. See H.R. CONF. REP. 104-369 at 37.
>
> Congress enacted the PSLRA to put an end to the practice of pleading "fraud by hindsight." See, e.g., Medhekar v. United States Dist. Ct., 99 F.3d 325, 328 (9th Cir. 1996) (holding that Congress intended for complaints under the PSLRA to stand or fall based on the actual knowledge of the plaintiffs rather than information produced by the defendants after the action has been filed).

Silicon Graphics, 183 F.3d at 988.

judicial notice. Metzler, 540 F.3d at 1061. Pierce has requested that the Court take judicial notice of the documents attached to the Declaration of Ann Bender in support of his motion to dismiss. Plaintiffs do not dispute the authenticity of the documents or object to the Court considering any of them. The attached consulting agreement between Stock Group, AG and CellCyte and the Rapholz brochure were both referenced in plaintiffs' SACC, so they are incorporated by reference. Pursuant to Evidence Rule 201(b), the Court also takes judicial notice of the documents, as well as notice of the Factual Information Review dated August 15, 2007 and the CellCyte Prospectus filed with the SEC in July 2007.

The Court declines to take judicial notice of the two remaining exhibits, which include (1) the extract list of companies from the Companies Registry, Grand Turk, and (2) downloaded pages from Yahoo! Finance on March 4, 2009 purportedly reflecting the price of CellCyte shares. Those documents are not relevant to the outcome of this motion.

**D.  Application of the PSLRA to Plaintiffs' Allegations**.

    **1.  Securities Fraud under Section 10(b).**

Plaintiffs contend that defendants "engaged in a scheme to deceive the market" and the "scheme included . . . the promulgation of promotional material by Pierce that falsely touted [CellCyte's] success." SACC at ¶¶ 124, 150. However, the Supreme Court has rejected "scheme" or aider and abettor theories of liability under Section 10(b). See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148 (2008). Therefore, plaintiffs cannot prevail on a theory that all of the defendants engaged in a securities fraud scheme.

    **a.  No False Statements Attributable to Pierce.**

1         To survive a motion to dismiss, a PSLRA complaint must specify each false or
misleading statement made by each particular defendant and the reasons why each one
was false or misleading. 15 U.S.C. §78u-4(b)(1). Pierce contends that the SACC fails to
identify any false or misleading statements made by him. Undisputedly, the SACC does
not contain any direct quotes from Pierce. Instead, plaintiffs attempt to impute statements
made by other defendants to Pierce under the group pleading doctrine. Under that
doctrine, it is presumed that the allegedly false and misleading "group published
information" is the "collective action of officers and directors." In re GlenFed, Inc. Sec.
Litig., 60 F.3d 591, 593 (9th Cir. 1995). Regardless of whether the doctrine survived the
enactment of the PSLRA, it is inapplicable to these circumstances. Pierce was not a
director, officer, or employee of CellCyte. Nor was he involved in the Company's
management or the dissemination of public information like SEC filings. Therefore, the
group pleading doctrine cannot be used to attribute statements to Pierce.

        Plaintiffs also allege that statements in the Rapholz brochure can be imputed to
Pierce. Pierce counters that pursuant to a consulting agreement between Stock Group,
AG and CellCyte, CellCyte was required to, and did, review all of the factual content for
the brochure. Declaration of Ann Bender, (Dkt. #143) ("Bender Decl."), Ex. A
(consultant agreement states, in all capital letters, that "all . . . consultant prepared
documentation concerning the company . . . shall be prepared by consultant from
materials supplied to it by the company and shall be approved by the company in writing
prior to any dissemination by the consultant"). The Rapholz brochure contains the
following disclaimer: "The factual information contained in this Report specifically
pertaining to CellCyte business, operations or financial records (the "CellCyte Facts")
have been reviewed and verified for accuracy by CellCyte." Id., Ex. C at p. 26.

ORDER GRANTING DEFENDANT
PIERCE'S MOTION TO DISMISS- 8

Consistent with those disclaimers, Reys approved the FIR document and all of the statements therein as factually accurate. On that basis, plaintiffs concede that none of the statements in the FIR, including those statements that were incorporated into the Rapholz brochure, is actionable against Pierce. Instead, plaintiffs contend that Pierce drafted additional falsities and included them, without CellCyte's approval, in the final Rapholz brochure. A comparison of the FIR and the Rapholz brochure reveals that many of the allegedly "new" falsities appear, verbatim, in the FIR. Only the following statements were not already in the FIR:

- "Now, a practical 'pill-in-a-bottle' application **puts the miracle of regenerative medicine within immediate reach.**" SACC at ¶ 83 (only the words in bold were "new" to the Rapholz brochure).

- "The technology is real. It's here now." Id.

- "Repair your own heart . . . regenerative medicine in on the verge of an enormous and historic leap forward." Id.

- "Grow-your-own repair tissues!" Id.

Plaintiffs contend that Pierce must have added those statements because they did not appear in the FIR. Even if that were true, the statements are not actionable against Pierce. The statements that "regenerative medicine is on the verge of an enormous and historic leap forward" and "the miracle of regenerative medicine [is] within immediate reach" are immaterial puffery. Such "loosely optimistic statements" reflecting corporate optimism are not actionable. See, e.g., City of Monroe Employees Ret. Sys. v. Bridgestone Corp., 399 F.3d 651, 671 (6th Cir. 2005) (explaining that statements are not actionable when they are "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision") (citing numerous cases).

Furthermore, although the above statements are worded slightly differently, they

ORDER GRANTING DEFENDANT
PIERCE'S MOTION TO DISMISS- 9

are entirely consistent with statements already contained in the FIR. Compare Rapholz Brochure ("Grow-your-own repair tissues!") with FIR at p. 3 ("A heart attack victim could quite literally be able to grow new heart tissue and regain significant heart function with the use of their own stem cells."). Plaintiffs also contend that the additional statements say "that CellCyte's technology was already proven and that it had created products that would be produced and available for market immediately." Plaintiff's Opposition at p. 7 (citing SACC at ¶ 83). By approving the FIR, however, Reys approved statements to the effect that the technology was already proven: "CellCyte has a breakthrough patented technology" and citing successful pre-clinical studies. FIR at p. 2. Because Reys approved the factual accuracy of the statements, they are not attributable to Pierce.

Moreover, despite plaintiffs' claim to the contrary, the Rapholz brochure did not state that the products were available for market immediately. In fact, the Rapholz brochure states that the technology could be available in "as soon as 3 to 5 years" and that the company had not yet filed an initial new drug application with the FDA. Rapholz Brochure at pp. 5, 7. The allegedly false statements must be read in context. See, e.g., Haskell v. Time, Inc., 857 F. Supp. 1392, 1399 (E.D. Cal. 1994) ("[I]f the alleged misrepresentation, in context, is such that no reasonable consumer could be misled, then the allegation may also be dismissed as a matter of law."). Reading the statements in context, no reasonable investor would believe that the product was commercially available immediately as plaintiffs allege. Because the operative complaint fails to attribute any false or misleading statements to Pierce, it is subject to dismissal.

### b. Lack of Scienter.

ORDER GRANTING DEFENDANT
PIERCE'S MOTION TO DISMISS- 10

Reys' verification of the factual content of the Rapholz brochure also renders implausible the allegation that Pierce knew the statements were false. Plaintiffs have cited no evidence to show that Pierce knew the statements were false. The SACC alleges that "he was reckless in failing to obtain such knowledge by refraining from taking those steps necessary to discovery whether those statements were false or misleading." SACC at ¶ 153. Plaintiffs, however, have cited no evidence to show that Pierce was responsible for determining whether the statements were false. In fact, the consulting agreement placed that responsibility solely with CellCyte. Legally, allegations that a defendant had access to contradictory information is insufficient to show scienter. See e.g., Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1035-36 (9th Cir. 2002). As set forth above, the PSLRA requires more than mere negligence, a motive, or access to the truth. By failing to allege scienter sufficiently, the SACC fails to state a claim.

### 2. Control Person Liability and Leave to Amend.

In addition to the Section 10(b) claim, the SACC asserts a claim for "control person" liability against Pierce under Section 20(a), 15 U.S.C. § 78(a). To state a claim for control person liability, a plaintiff must adequately allege: (1) a primary violation of federal securities laws, and (2) that the defendant exercised actual power or control over the primary violator. See, e.g., Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000).

In this case, plaintiffs concede that the SACC does not sufficiently plead that Pierce is a control person of CellCyte. In light of that concession, they seek leave to amend. Federal Rule of Civil Procedure 15(a)(2) directs federal courts to "freely give leave [to amend] when justice so requires." The Court has discretion to deny leave to amend when the record reveals "undue delay, bad faith or dilatory motive on the party of

ORDER GRANTING DEFENDANT
PIERCE'S MOTION TO DISMISS- 11

the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of amendment." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1007 (9th Cir. 2009) (internal citations and quotations omitted). Because the PSLRA is so technical and demanding, "the drafting of a cognizable complaint can be a matter of trial and error," making it even more important to allow the filing of successive pleadings in this context. Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003). However, plaintiffs have already amended their complaint twice.

Plaintiffs seek leave to amend in two ways. First, they would amend to allege that Stock Group, AG is a primary violator and Pierce is secondarily liable as a controlling person of Stock Group, AG. Plaintiffs seek to add allegations that Pierce and Stock Group, AG authored the text of the Rapholz brochure as part of Stock Group, AG's consulting agreement with CellCyte, that Pierce is a control person of Stock Group, AG, and that he is liable for that entity's Section 10(b) violations. However, plaintiffs have not alleged any actionable misstatements or the requisite state of mind by Stock Group, AG. Instead, plaintiffs contend that Stock Group, AG, presumably via some unnamed person, is responsible for the same misstatements that they attribute to Pierce. As set forth above, Reys approved all of the factual content of the Rapholz brochure and the "added" statements are not actionable. For these reasons, the proposed amendment is denied as futile.

Second, during oral argument, plaintiffs requested leave to amend to include information found in two SEC complaints, one against Reys and the other against CellCyte and Berninger (collectively, the "SEC complaints"). The SEC complaints were filed on September 8, 2009 in the U.S. District Court for the Western District of

ORDER GRANTING DEFENDANT
PIERCE'S MOTION TO DISMISS- 12

Washington. Specifically, the SEC complaints allege that in "late 2006," CellCyte and a "Canadian stock promoter," who is undoubtedly Pierce, "conducted a reverse merger between CellCyte and [a public] shell company," which was controlled by Pierce, that made CellCyte a public company. SEC Complaint against CellCyte at ¶ 18.[3] As part of the reverse merger, CellCyte received approximately $6 million and Pierce received approximately 15 million "purportedly 'freely tradeable' CellCyte shares. As a result, the stock promoter controlled about 90% of CellCyte's public float (the shares outstanding and available for trading by the public)." Id. at ¶ 19. Based on those allegations, plaintiffs contend that Pierce was a control person of CellCyte because he controlled a large percentage of its stock. Plaintiffs have alleged only that Pierce was responsible for misrepresentations in the Rapholz brochure, which was published in the fall of 2007. However, plaintiffs' SACC contends that CellCyte's Prospectus filed with the SEC on July 11, 2007 stated that Pierce owned 2.7% of the company's stock as of June 28, 2007. Id. at ¶ 23. According to plaintiffs' own allegations and the company's public filings, Pierce owned only a small percentage of the company's stock at the time the Rapholz brochure was disseminated. Even if the Court also considered Pierce's wife's stock holdings, by plaintiffs' own allegations Pierce controlled only 10% of the company's stock at the relevant time. Id. An individual's status as a minority shareholder is insufficient, without more, to establish control person liability. See, e.g., In re Gupta Corp. Sec. Litig., 900 F. Supp. 1217, 1243 (N.D. Cal. 1994); In re Flag Telecom Holdings Ltd. Sec. Litig., 308 F. Supp. 2d 249, 273-74 (S.D.N.Y. 2004) (explaining that the fact that an entity owned 30% of a company's stock and helped found the company was

---

[3] According to the SEC complaint against Reys, the reverse merger officially closed in March 2007.

ORDER GRANTING DEFENDANT
PIERCE'S MOTION TO DISMISS- 13

insufficient to establish control).[4]

In addition, the Court will not presume that Pierce exercised control based on his stock holdings. Rather, "[t]here must be some showing of actual participation in the corporation's operation or some influence before the consequences of control may be imposed." Burgess v. Premier Corp., 727 F.2d 826, 832 (1984) (internal citation and quotation omitted).[5] Other than noting Pierce's stock holdings, plaintiffs have not sought to amend to allege any facts to show any actual participation in the company's operations or influence over the same. Nor will the Court permit plaintiffs to conduct a fishing expedition in the hopes of finding material to support their vague request to amend. This case has been pending for over a year and a half, and plaintiffs have had ample time to conduct an investigation and formulate their contentions regardless of the SEC's actions. For these reasons, plaintiffs' request to amend their complaint is denied.

### III. CONCLUSION

For all of the foregoing reasons, defendant Pierce's motion to dismiss (Dkt. #142)

---

[4] See also Theoharous v. Fong, 256 F.3d 1219, 1227-28 (11th Cir. 2001) (dismissing control person claim against an individual who owned 39% of the company's stock and could appoint four of nine directors); Aldridge v. A.T. Cross Corp., 284 F.3d 72, 85 (1st Cir. 2002) (declining to impose Section 20(a) liability on controlling shareholders where there was no evidence that they were "actively participating in the decisionmaking processes of the corporation").

[5] See also No. 84 Employer-Teamster Joint Counsel Pension Trust Fund v. Am. West Holding Corp., 320 F.3d 920, 945 (9th Cir. 2003) (explaining that whether defendant is a control person includes scrutiny of his or her participation in the company's day-to-day operations and power to control corporate actions); see also 17 C.F.R. § 230.405 (defining "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.").

is GRANTED and the claims in the Second Amended Consolidated Class Action Complaint against defendant Pierce are hereby DISMISSED.

DATED this 23rd day of September, 2009.

_____
Robert S. Lasnik
United States District Judge

ORDER GRANTING DEFENDANT
PIERCE'S MOTION TO DISMISS- 15